AUSA Amarjeet Bhachu (312) 469-6212
AUSA Sarah Streicker (312) 353-1415

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EDWARD M. BURKE

CASE NUMBER:

**19 CR 001**

MAGISTRATE JUDGE FINNEGAN

**UNDER SEAL**

**FILED**

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

JAN 02 2019
MAGISTRATE JUDGE
SHEILA M. FINNEGAN

Beginning no later than in or around 2017 and continuing through in or around 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1951 | did knowingly attempt to commit extortion, which extortion would obstruct, delay and affect commerce, in that defendant attempted to obtain property, namely, fees arising from the retention of his law firm, Klafter & Burke, to be paid by Company A and its affiliate, with the consent of Company A and its affiliate, induced by the wrongful use of actual and threatened fear of economic harm, and under color of official right |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Edward W. McNamara* (signature)

EDWARD W. McNAMARA
*Special Agent*
*Federal Bureau of Investigation*

Sworn to before me and signed in my presence.

Date: January 2, 2019

*Sheila Finnegan* (signature)
*Judge's signature*

City and state: Chicago, Illinois

SHEILA FINNEGAN, U.S. Magistrate Judge
*Printed name and Title*

**FILED**

JAN 02 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## AFFIDAVIT

I, EDWARD W. McNAMARA, being duly sworn, state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since approximately 1992. My current responsibilities include the investigation of public corruption offenses. I have investigated, among others, cases involving attempting, by extortion, to obstruct and affect commerce, in violation of Title 18, United States Code, Section 1951. During my tenure as an FBI Special Agent, I have been involved in various types of electronic surveillance, physical surveillance, and the execution of search warrants.

2.    I have been involved in the investigation of EDWARD M. BURKE concerning his involvement in violations of federal law, including violations of Title 18, United States Code, Section 1951.

3.    The information contained in this Affidavit is based on my participation in this investigation; agents' review of court-authorized interceptions of wire communications; the results of physical surveillance; witness interviews; review of records obtained from various parties; discussions with other law enforcement agents with knowledge of this investigation; my training and experience; and the training and experience of other law enforcement officers with whom I have consulted. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set

forth herein, I have not included each and every fact known to me concerning this investigation.

4.     This Affidavit is made for the purpose of establishing probable cause in support of a complaint charging EDWARD M. BURKE with attempting, by extortion, to obstruct and affect commerce, in violation of Title 18, United States Code, Section 1951.

5.     Reference is made to lawfully recorded conversations in this affidavit. In certain instances, these conversations are summarized and placed in context. My understanding of these conversations (which often appears in brackets) is aided by the content and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, the experience of other law enforcement agents and officers in this investigation, my discussions with other law enforcement officers, and other evidence developed during the course of this investigation. The times listed for recorded conversations are approximate. Further, summaries of the recorded conversations herein do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

I.     **Summary of Probable Cause**

6.     There is probable cause to believe that EDWARD M. BURKE, an Alderman for the City of Chicago, has engaged in attempted extortion in violation of Title 18, United States Code, Section 1951. Specifically, in 2017, Company A sought permission from the City of Chicago to remodel a restaurant, and Company A sought BURKE's support for the building permit for this remodeling project. In June 2017, BURKE

2

arranged to meet with Individual A and Individual B, two executives from Company A, and used his position as an Alderman—including his apparent ability to withhold his official support for the building permit and a related driveway permit—in order to corruptly solicit unlawful personal financial advantage in the form of fees arising from the retention of BURKE's law firm, Klafter & Burke, by Company A and its affiliates. Individual A understood that BURKE solicited this business in exchange for BURKE's help and support with obtaining the permits for the restaurant remodeling.

7.     After this meeting, Company A did not deliver business to BURKE's law firm as BURKE requested, so BURKE planned with Ward Employee 1 to play "hard ball" with Company A and its executives, in order to force Company A to award tax business to BURKE's law firm. In October 2017, at BURKE's direction, Ward Employee 1 caused remodeling work on the restaurant to come to a halt on the pretext that the restaurant did not possess all necessary permits for the remodeling, and thereafter obstructed Company A's efforts to promptly obtain a driveway permit from the City of Chicago's Department of Transportation.

8.     Through this extortionate conduct, BURKE caused Individual A and Individual B to travel to Chicago for the purpose of meeting with him on or about December 12, 2017. During that meeting, which focused on awarding tax work to BURKE's law firm, BURKE received assurances that his law firm would indeed receive tax work, and after this meeting, BURKE dropped his opposition to the issuance of a driveway permit. On or about December 19, 2017, BURKE confirmed that his law firm was to receive property tax work for multiple properties operated by Company A in

3

Illinois, and, on that same day, Company A received approval for a driveway permit from the Department of Transportation. Furthermore, BURKE also solicited a campaign contribution from Individual A for another politician—a contribution that Individual A felt obliged to give in order to prevent BURKE's further interference with Company A's restaurant. After the driveway permit was issued, Company A completed the remodeling of the restaurant but did not hire BURKE's firm.

## II. Facts Establishing Probable Cause

### A. Background

9. According to public records as well as my training and experience, I know the following: The City of Chicago is a municipal corporation and a municipal subdivision of the State of Illinois. The City's legislative branch is the City Council, which is comprised of fifty aldermen, each of whom represents one legislative district or "ward." Aldermen are compensated and publicly elected. The City Council has the authority to set policy and pass ordinances and resolutions related to the responsibilities of City government. Another function Aldermen provide is their official support or non-support for real estate development projects proposed for land in their respective wards, which support or non-support can be instrumental in securing necessary governmental action or inaction relating to the proposed projects, as well as the assistance or non-assistance of third parties concerning the projects. Aldermen are assisted in their official duties by staff members, who often are paid City employees. Aldermen have offices within City Hall, which is located at 121 North LaSalle Street in Chicago, as well as offices within their wards.

4

10.    Public records reflect that EDWARD M. BURKE is Alderman of the Fourteenth Ward in Chicago and the Chairman of the City Council's Committee on Finance. BURKE occupies an office at City Hall, and maintains an office in his ward, located at 2650 West 51st Street in Chicago.

11.    Public records further reflect that BURKE is an attorney and a partner in the private law firm of Klafter & Burke, which specializes in real estate tax assessment work. Publicly available records maintained by the Attorney Registration and Disciplinary Commission ("ARDC") reflect that BURKE is licensed to practice law in Illinois and was admitted to practice law in 1968. BURKE's registered business address with the ARDC is Klafter & Burke, 225 West Washington Street, Suite 1301, Chicago, Illinois 60606-2418.

**B.    Company A Executives Seek BURKE's Approval to Remodel a Restaurant.**

12.    Individual A has been interviewed by law enforcement, and has provided the following information.[1] Individual A is an executive for Company A, which operates over one hundred fast-food restaurants in Illinois, including a fast-food restaurant in BURKE's ward. In 2017, Company A prepared to remodel the restaurant in BURKE's ward, and an architect engaged by Company A sought a building permit from the City of Chicago's Department of Buildings to remodel the restaurant.

---

[1]    Individual A and Individual B were approached by law enforcement after the events discussed herein occurred. Individual A and Individual B have been advised that they are considered to be victims of BURKE's illegal activity, and they each have been provided with a non-target letter by the government. Individual A and Individual B are related.

13.     Email communications obtained from Individual A, as well as from Individual B, another Company A executive, reflect that Company A's architect advised Individual B on multiple occasions in or around May 2017 and June 2017, that, before a building permit could be issued, Company A would need to receive a signed Aldermanic Acknowledgement Letter from BURKE. The architect provided Individual B with a form Aldermanic Acknowledgment Letter, to be signed by BURKE, which provided, in part: "I am aware of the application for a building permit at the following address. I have no objection to its issuance."[2] The architect advised that BURKE wanted to meet with Individual B to discuss trucks parking in the restaurant parking lot.

14.     During the course of the investigation of BURKE, the Chief Judge and Acting Chief Judge of the United States District Court for the Northern District of Illinois entered orders authorizing the interception of wire communications over telephone number (312) XXX-4006, a cellular telephone used by BURKE (the "**Target Phone**"). The recorded telephone conversations over the **Target Phone** referenced herein were made pursuant to these orders.[3]

---

[2]     Based on information provided by a Department of Buildings supervisor, I know that for the remodeling project a signed Aldermanic Acknowledgement Letter is not a prerequisite to the issuance of a building permit, but is included in the permit package that the Department of Buildings provides for projects like the remodeling of the restaurant, and will serve to accelerate the processing of the permit by reducing a ten-day waiting period that the Department of Buildings observes prior to issuance of such a permit.

[3]     BURKE was identified as the user of the **Target Phone** by, among other things, self-identification during the course of telephone calls, as well as comparison of the voice of the user of **Target Phone** with publicly available recordings of BURKE. Individual A and Individual B were identified through various means, including self-identification.

15. On or about May 23, 2017, at approximately 5:12 p.m. (Session #309), BURKE received a voicemail on the **Target Phone** from Individual A regarding the building permit. Specifically, Individual A said, "If you could please give me a call when you get a minute, when you get a chance. [phone number redacted] Ah, we have an application that's been made for remodel and I think it's stuck in your office or something. So, please give me a call, I'll give you the details."

16. On or about May 25, 2017, at approximately 3:39 p.m. (Session #414), BURKE received an incoming call on the **Target Phone** from Individual A. During the call, BURKE and Individual A discussed the building permit. Specifically, Individual A said, "Ah, one of the things I was calling about, Ed, is, ah, we have a remodeling permit that we have applied for and I think it's in your area and, uh . . . ." BURKE said, "Is that the one that's at, ah, [address of restaurant redacted]?" Individual A said, "Yes, yes, yes." BURKE said, "Okay." Individual A said, "So, ah, basically, excuse me just a second, want to meet you to discuss a concern with truck parking that's in our parking lot." BURKE said, "Yeah, that's been an ongoing problem there." Individual A said, "Oh, really?" BURKE said, "Yeah. They have these big rigs that are parking there and parking overnight and that sort of stuff, ah, so some of the community activists are giving me a little aggravation about it. Tell me about, ah, who's ah, who's on the ground here in Chicago? Who's your key person?" Individual A said, "Ah, key person . . . . You know it's, ah, [Individual B]." BURKE said, "Why don't you have [Individual B] give me a call on this number. Maybe we can get together next week and see if we can iron out what the issues might be." Individual A said, "Awesome. Sounds good."

17.     On or about June 1, 2017, at approximately 4:32 p.m. (Session #642),
BURKE received an incoming call on the **Target Phone** from Individual B. During the
call, BURKE and Individual B discussed meeting about the building permit. Specifically,
BURKE said, "Well, I was gonna suggest if you were here that you come out and see me
and talk about this issue." Individual B said, "Well, I'll be in, I'll, I'll be in Chicago not
next week, but the following week. So I would love to come by and meet you and talk
about things." BURKE said, "Good. And [Individual A] said that he hoped to be up here
too and have, perhaps dinner and so that'd be nice. I look forward to that . . . . Um, now,
ah, is there something urgent? He mentioned something about permitting." Individual
B said, "Yes. So, we were trying to remodel a [name of restaurant] at ah—" At that
point, the call was minimized.

### C.     BURKE Plans to Obtain Private Benefits from Company A in the Form of Fees Arising from the Retention of His Law Firm, Klafter & Burke.

18.     On or about June 8, 2017, at approximately 11:47 a.m. (Session #938),
BURKE placed an outgoing call on the **Target Phone** to his City Hall office and spoke
with a City of Chicago employee on his staff (hereinafter referred to as "City Employee
1"). During the call, BURKE asked City Employee 1 to find out what private law firm
handled real estate tax work for Company A. Specifically, BURKE said, "And there's a
[restaurant] in the [location redacted]. Ah, just north of [street redacted] Street on the
west side of the street."[4] City Employee 1 said, "Uh-huh. Yeah." BURKE said, "I want

---

[4]     Based on physical surveillance conducted by law enforcement, I know the restaurant
operated by Company A in BURKE's ward is located in the area BURKE referenced
during this call.

somebody at the law office to check to see who's filed with the assessor of the board on that one." [BURKE wanted City Employee 1 to contact his private law firm and ask someone there to research what law firm represented the restaurant in prior challenges to real estate taxes.] City Employee 1 said, "On that [restaurant]? Okay. And that's the one where you're meeting—" BURKE said, "That's where I'm supposed to be meeting those people next week?" City Employee 1 said, "Yeah, exactly."

19.     On or about June 11, 2017, at approximately 12:42 p.m. (Session #1030), BURKE received an incoming call on the **Target Phone** from Individual C.[5] During the call, BURKE informed Individual C that BURKE wanted to get some business for his private law firm from Individual A. Specifically, Individual C said, "Happy Sunday. I'm about to have lunch with our friend, [Individual A], so I hope your meeting with him went well." BURKE said, "Well, we haven't met yet. Ah, he's supposed to be, ah, coming here this coming week and we're gonna visit one of his sites and have lunch." Individual C said, "Oh, good, good. I'm about to have lunch with him now. I know I'm in Canada after my commission meeting on Tuesday, so I figured if he wanted to grab lunch with me, I'd better do it now. But I'll tell him you're looking forward to it." BURKE said, "Yes, and give him the old, ah, ah . . . ." Individual C said, "I'll let him know how important you are." BURKE said, "Well, you're good to do that but I'd also like to get some of his law business and get him involved, ah, here in, ah, in ah—" Individual C said, "Chicago." BURKE said, "Yeah, and, you know, he's a [unintelligible] businessman here and you gotta, ah, be

---

[5]     According to public sources, Individual C was a public official in the same state where Individual A and Individual B reside.

active." Individual C said, "Yeah. And he's pretty substantial. He's has a lot of, a lot of stuff out there, right?" BURKE said, "I hear he's got 300 [restaurants] here." Individual C said, "Huh. Okay, okay, yeah." BURKE said, "So he's somebody you and I should, ah—" Individual C said, "Well, keep me posted." BURKE said, "—try and, ah, ah, get to know." Individual C said, "Okay. Good. I'm glad you called me about it. And, uh, that's why I figured I'd work him. But I'll make sure he, he understands it." BURKE said, "Good."

### D.  BURKE Corruptly Solicits Tax Work for His Law Firm from Individuals A and B.

20.     Individual A provided law enforcement with the following information. Individual A and Individual B agreed to meet with BURKE in Chicago because they hoped BURKE would help with the building permit for the restaurant remodeling and because Individual C had told Individual A that BURKE was someone Individual A should know.  On or about June 14, 2017, Individual A, Individual B and two other employees of Company A met with BURKE and Ward Employee 1[6] at the restaurant.[7] During the meeting at the restaurant, BURKE talked about the fact that the City had received complaints about trucks parking in an adjacent parking lot.  Individual A promised to look into the matter and address the issue by putting up "No Parking" signs.

---

[6]     Based on the results of physical surveillance, evidence seized from BURKE's ward office, and calls intercepted over the **Target Phone**, I know that Ward Employee 1 works in BURKE's ward office.

[7]     On or about June 14, 2017, at approximately 11:35 a.m., law enforcement surveillance observed a group of individuals, including Individual A, Individual B, BURKE and Ward Employee 1 meet in the area of the restaurant.

BURKE also mentioned that a driveway permit was required for the remodeling of the restaurant. Individual A believed that BURKE was making up the driveway permit issue to create a problem that they would have to meet with BURKE about.[8]

21.    Individual A further advised that, following the meeting at the restaurant, BURKE, Individual A, Individual B, and another Company A employee had lunch with BURKE at a country club.[9] BURKE arranged for the lunch. During the lunch, BURKE told his guests about his law firm, and explained that his law firm handled property tax reductions. Individual A said that s/he had not requested a pitch from BURKE about his law firm, and had never mentioned to BURKE that s/he needed a property tax attorney.[10] Individual A advised BURKE that s/he had a law firm that handled such matters, but that Individual A would talk to another individual who handled property taxes and would have that person reach out to BURKE.

22.    Individual A advised law enforcement that Individual A "read between the lines," and that it was Individual A's understanding that BURKE was soliciting legal business in exchange for his help with permits for the restaurant.

---

[8]    Individual B told law enforcement that BURKE had mentioned driveway permits during the meeting. Individual B explained that s/he could not recall an issue about driveway permits ever coming up in connection with any other restaurant owned by Company A in the Chicago metropolitan area. Individual A advised law enforcement that BURKE was told both issues—the truck parking and the driveway permit—would be addressed.

[9]    On June 14, 2017, at approximately 12:30 p.m., surveillance observed a Black Crown Victoria in the parking lot of the Beverly Country Club, in Chicago, Illinois. Surveillance had observed BURKE riding in this vehicle earlier that day on several occasions, including at approximately 12:03 p.m. Subsequent wire interceptions and seizures discussed below confirm this meeting took place at the Beverly Country Club.

[10]    Individual B confirmed that BURKE's pitch was unsolicited, and Individual B found it odd that BURKE was seeking business from them due to his official position.

23.     Individual A explained that Individual A did not take action to immediately hire BURKE's law firm because it was not a priority. Individual A explained that Individual A believed that the permit issue concerning the restaurant had been resolved, and that another firm handled property tax matters.

24.     According to records obtained from the City of Chicago's Department of Buildings, the City issued a building permit for the restaurant on or about June 20, 2017.

25.     On or about June 27, 2017, at approximately 2:23 p.m. (Session #1779), BURKE received an incoming transferred call on the **Target Phone** from Individual B. During the call, BURKE and Individual B discussed BURKE's assistance with obtaining a permit for the restaurant, and Company A providing business to BURKE's private law firm. Specifically, BURKE said, "Hello my friend in [city redacted]. How are you?" Individual B said, "Good, Mr. Burke. How are you?" BURKE said, "Good, um, I haven't heard back. I'm just checking in with you." Individual B said, "Well, Mr. Burke, since we last spoke, we did look at the survey and the truck parking is part of our lot so we confirmed that part." BURKE said, "Oh, that's good. So I made you half a million bucks." Individual B laughed and said, "Yes sir, you did. Um, we have ordered signs to post in that area and those signs came in on Friday. I have the restaurant manager, the district manager putting up the signage today and once that signage is posted, they're going to send me pictures and I can send that over to you as well. They'll also be enforcing the no overnight parking now that we're going to 24 hours, and we will be making sure that if a truck is there overnight, that we will be asking them to leave, and if we have any issues then we will be calling the local police department to help us." BURKE said, "Good. And

um, we were going to talk about the real estate tax representation and you were going to have somebody get in touch with me so we can expedite your permits." Individual B said, "I'm sorry Mr. Burke. What was that last part?" BURKE said, "You were going to have somebody call me so we can help you make sure you get your permits for the remodeling." Individual B said, "Yes, I believe, I thought my architect had reached out to you. Um, I guess, now that I'm talking to you, he has not. So I will follow up with him." BURKE said, "Unless he's talked to my assistant [Ward Employee 1], but I doubt that. I imagine he would have mentioned it to me." Individual B said, "I will, I will follow up with the architect and have him reach out as soon as possible and I will have somebody from our [city redacted] office reach out to you regarding the property taxes. That's not something I manage on my end." BURKE said, "Okay good. So I look forward to hearing from you and thanks for being responsive." Individual B said, "No problem, Mr. Burke."

26. Individual B advised law enforcement that s/he felt that it was inappropriate for BURKE to link obtaining tax work with BURKE's official assistance concerning the driveway permits.[11]

27. Email communications produced by Individual A and Individual B reflect that on or about June 29, 2017, Individual B received an email from an employee of Company A. In that email, the employee advised Individual B that Ward Employee 1

---

[11] When initially interviewed by law enforcement, Individual B listened to the June 27, 2017, call. Individual B stated that s/he did not realize at the time of this call that there was a *"quid pro quo"* arrangement between approval of the permits and giving BURKE's law firm work, but that after listening to the call, Individual B realized that if BURKE's law firm was used to handle property taxes, then there would not have been problems with the remodeling project, and that there was an "implied understanding" that they needed to use BURKE's law firm.

13

asked that Individual B be reminded "that we need to get our permitting in order for the driveway."

28.     I know, based on information obtained from the City of Chicago and publicly available information, that the City of Chicago's Department of Transportation issues commercial driveway permits. In order to obtain a driveway permit for a pre-existing driveway, an applicant must complete an application, and among other things, demonstrate that the driveway is insured and that the City of Chicago is insured with respect to the driveway approach. Issuance of a permit for a pre-existing driveway does not require any form of Aldermanic approval. The permit is renewed annually, and the City of Chicago collects an annual fee with each such permit.

29.     Information obtained from the City of Chicago's Department of Transportation and DOT Employee 1, a City employee that helps administer the City's driveway permit program, reflects that the restaurant was located adjacent to a strip mall. In 2012, another entity applied for a permit for nine new driveways associated with this development, which was granted. The 2012 permit was reissued in 2015, and it did not require any form of Aldermanic approval because it covered pre-existing driveways.

30.     Records obtained from Individual A and Individual B, as well as records obtained from the City of Chicago, reflect that the remodeling work on the inside and outside of the restaurant did not involve the construction of any new driveways.

**E.     BURKE Discusses Extorting Individuals A and B with Ward Employee 1 Due to Their Failure to Award His Firm Tax Work.**

31.     On or about August 2, 2017, at approximately 11:27 a.m. (Session # 3560), BURKE placed an outgoing call on the **Target Phone** to Ward Employee 1. During this

14

call, BURKE inquired about the status of the restaurant remodeling project. Specifically, BURKE asked, "Did we ever hear any more from those [restaurant] people on [street name redacted]?" Ward Employee 1 responded, "No, not a word . . . Not a word. It's why, they called me about three weeks ago talking about their remodeling, 'Geez,' I said, 'Think the owners were supposed to get back with the Alderman after they had lunch,' and that's how I left it." BURKE responded, "And the trucks are still parked there." Ward Employee 1 replied, "Well the trucks, they put up, the trucks, they put up signs that say 'No Parking' from like 11 to 4 in the morning, their closed hours. The trucks, you know, because the trucks that are coming in there, those are the guys that are coming in there now, but there's not supposed to be any trucks parked overnight. And they've got the big, and they've got the big signs up on that, I went out there and I took pictures, I've got the pictures showing it says from 11 to 4 no parking." BURKE responded, "Okay." Ward Employee 1 asked, "So on that one, okay, but nothing else happened?" BURKE replied, "No."

32. According to records produced by Individual A and Individual B, and the architect for Company A, after the building permit was received on or about June 20, 2017, and a subsequent building permit was issued on or about September 22, 2017 (to account for a new general contractor on the remodeling project), remodeling work on the restaurant began on or about October 18, 2017.

33. On or about October 24, 2017, at approximately 9:57 a.m. (Session #7441), BURKE made an outgoing call on the **Target Phone** to Ward Employee 1. During this call, BURKE and Ward Employee 1 discussed interfering with the operation of the

15

restaurant. Specifically, BURKE told Ward Employee 1, "I just drove by the [restaurant] . . . And there appears to be, ah, remodeling work going on there. Weren't we supposed to be contacted, ah—" Ward Employee 1 responded, "Yeah." BURKE said, "—before they did any work? What ah, what happened there?" Ward Employee 1 responded, "Let me ah, I don't know. Let me get out there, cause ah, find out, they weren't supposed to do anything. No." BURKE asked, "What was the issue? Why, why was I . . . able to hold it up?" Ward Employee 1 replied, "Well the issue was you were, you had met, um—" BURKE said, "I know that. Why was I able to hold it up? What did they need from me?" Ward Employee 1 responded, "Um, well they needed their driveway permits and everything signed off on." BURKE said, "Well, I don't remember signing off on any driveway permits."[12] Ward Employee 1 responded, "No. I never remember seeing anything come in. Let me get over there and see if there's an actual permit in the window. I'll get over there. Cause I mean ah, yeah. They knew that they were, I mean we, how many times, we had two different meetings with those people." BURKE replied, "Yep." BURKE further said, "And they appear to be ah, operating the drive-through. So maybe they're remodeling the inside for the people that are going to eat in, but it looks like cars are moving through there and picking up their orders . . . . But I don't know how that can happen if they don't have a driveway permit." [I believe BURKE instructed Ward Employee 1 to interfere with the operation of the restaurant,

---

[12]   As noted above, the driveways in the vicinity of the restaurant were pre-existing driveways that were built several years earlier, and no new permit concerning these driveways required Aldermanic approval. Nor were these driveways included as a part of the remodeling at the restaurant.

based on the pretext of the restaurant not having a driveway permit, when in fact BURKE sought to extort Company A because Individual A and Individual B had not provided BURKE with tax work for his firm.] Ward Employee 1 responded, "No. If they don't have any . . . . We'll get on 'em."

34.     Law enforcement has interviewed Individual D, an employee of Company A who has a senior regional managerial role in Company A, and is responsible for overseeing the operation of approximately 162 restaurants in the Chicagoland area. Individual D advised law enforcement that on or about October 24, 2017, Individual D received a telephone call from Ward Employee 1, who told Individual D that "the office" (which Individual D understood to be a reference to BURKE's office) never gave consent for or approval of the plans for the remodeling of the restaurant, and therefore work needed to halt at the location.

35.     Email communications supplied by Individual B reflect that on or about October 24, 2017, Individual D sent an email to Individual B and others concerning Ward Employee 1's telephone call. Individual D wrote in part as follows:

> Hello all
> I received a call today from Alderman Burke's office regarding [restaurant identification redacted] under remodel. [Ward Employee 1] (Alderman's assistant) said their office never signed off on the plans and the special use permit. He asked we shut the job down until we meet with them with the GC [general contractor] to review all proper permit documentation and the plans. [Company A employee name redacted] is scheduling this meeting ASAP. I asked [general contractor] to shut the job down for now until we see what else these guys are looking for to get the project moving again. I know these guys are very powerful and they can make life very difficult for all of our Chicago stores and I do

not want to take this risk at this time until we meet and discuss everything.

36. Individual A advised law enforcement that, as a result of this request, the remodeling of the restaurant was halted.

37. On or about October 25, 2017, at approximately 6:59 p.m. (Session #7537), BURKE made an outgoing call on the **Target Phone** to Ward Employee 1. During the call, BURKE and Ward Employee 1 discussed playing "hard ball" with Individual A and Individual B. Specifically, BURKE said, "I forgot to ask you, I'm just gonna be driving past the [restaurant]. What, what was the result of your inquiry?" Ward Employee 1 responded, "They're coming in tomorrow with all their, um . . . . They shut down the construction. They're coming in tomorrow to try to show us all their permits and the big thing is, you know, I mean they can go and get their building permits, but where's their driveway permits?" BURKE said, "And, and they didn't have their . . . didn't they have their permits posted on the site as they're supposed to?" Ward Employee 1 (speaking over BURKE) said, "Driveway permits . . . driveway permits. Yeah, but like I said yesterday, I couldn't see if they were posted or not because they had that big green construction fence out there that was out there. But my big thing is, if they haven't transferred over the driveway permits, it's illegal." BURKE replied, "Yeah." Ward Employee 1 said, "You know, but, hey, hey, not only, and I'm gonna put 'em out there and say, 'By the way, not only does the construction has [sic] to stop, the business has to

stop.'"[13]   BURKE said, "All the other licenses that they have."   Ward Employee 1 (speaking over BURKE) continued, "'You guys never transferred over.'"   BURKE said, "Yep . . . All the other licenses they have."   Ward Employee 1 responded, "Yeah, now that group—did they ever get back to you—" [I believe Ward Employee 1 asked BURKE whether the Company A or its representatives had contacted BURKE to arrange for his law firm to receive tax work.] BURKE said, "Never."   Ward Employee 1 continued, "—after your, ah—"   BURKE replied, "Never."   Ward Employee 1 continued, "—meeting at Beverly [Country Club]?"   BURKE said, "Never.   I took 'em [Individual A and Individual B] to lunch.   I was playing nice with 'em—never got back." [I believe BURKE explained to Ward Employee 1 that Individual A and Individual B never contacted BURKE about providing legal work for his private law firm as BURKE desired.][14]   Ward Employee 1 said, "To tell you the truth, I'm at Beverly right now."   Later in the conversation, Ward Employee 1 said, "You know, they're, you know, but that group never got back to you, right?"   BURKE responded, "Never."   Ward Employee 1 replied, "All right, I'll play as hard ball as I can."   BURKE said, "Okay."

---

[13]   Based on documents produced by Individual A and Individual B, the drive-through for the restaurant continued to operate during the remodeling of the internal seating area of the restaurant, including during the time period while the remodeling was halted.

[14]   As noted above, BURKE met with Individual A and Individual B on or about June 14, 2017, in order to solicit tax business from them.   Law enforcement surveillance observed BURKE attending a meeting at the restaurant on or about June 14, 2017, and thereafter, surveillance observed a vehicle associated with BURKE parked in the parking lot of the Beverly Country Club.   Individual A explained that during lunch at the country club, BURKE made an unsolicited pitch for tax work (referred to in this conversation by BURKE as " took 'em to lunch . . . I was playing nice with 'em").

38.     Individual D advised law enforcement that s/he attended a meeting at BURKE's ward office on or about October 26, 2017. Those in attendance included, but were not limited to, Ward Employee 1, Individual D, and the general contractor on the remodeling project. The purpose of the meeting was to identify what needed to be done to resume the remodeling project. During the meeting, Ward Employee 1 asked Individual D about the ownership of the restaurant, and Individual D advised that Company A, led by Individual A, owned the restaurant. Ward Employee 1 told the general contractor that Ward Employee 1's office never signed-off on the plans granting approval for the project. Ward Employee 1 asked the general contractor where his/her company was based and told the general contractor that there were local workers available to fill the jobs on the remodeling project. Individual D recalls Ward Employee 1 "drilling" the general contractor on this point. Ward Employee 1 reiterated not having seen "the plans," including the driveway permit. Individual D believed the reference to a driveway permit was a reference to a special-use permit for the restaurant's drive-through.[15] After the meeting, Individual D advised Individual B that Individual B would need to speak to BURKE's office in order to resolve the work stoppage.

39.     Individual D advised law enforcement that, during the course of remodeling approximately twelve to eighteen other restaurants in the Chicago area, Individual D had never seen an Alderman's office intervene in a remodeling project because the Alderman's office needed to see or approve the plans for the project. Individual D felt

---

[15]     Based on information provided by the architect (who is discussed in greater detail below), the restaurant had already obtained a special use permit for the use of the drive-through.

intimidated by Ward Employee 1 because the subcontractor work was not being performed by "locals." Individual D further believed that the Alderman's office wanted something unspecified that went beyond the issues related to the remodeling.

40. On or about October 26, 2017, the architect for Company A sent an email to multiple individuals within the City of Chicago's Department of Buildings, seeking their assistance. Specifically, the architect wrote in part:

> HELLO Please assist. . . . . See below as my client just informed me that Alderman Burke has shut this job down. This is quite disturbing considering that all of our restaurant projects follow the same process thru DOB [Department of Buildings] for permit submittal and Zoning approval. The process determines if a subject property has or does not have a Special Use in place for the Drive Thru part of the restaurant. . . . This does not seem right that Burke can shut this project down considering we have our permit. Please advise as soon as you can. Thank you

41. Law enforcement subsequently interviewed the architect. The architect explained that s/he had worked as an architect in the Chicago area for approximately 35 years, and had worked on projects throughout the Midwest and East Coast. The architect explained that s/he had done architecture work on restaurants throughout the City of Chicago and in various wards. The architect explained that the City of Chicago's Department of Transportation usually monitors driveway permits, and the architect had never heard of an Alderman tracking driveway permits. The architect further noted that s/he had never received a "stop work" order on any of his/her projects from any other Alderman and had never received a "stop work" order as a result of a driveway permit issue.

42. On or about October 27, 2017, a supervisory employee within the Department of Buildings, referred to herein as DOB Employee 1, advised the architect via email as follows: "I see no DOB [Department of Buildings] issues currently in our system. Please contact the owner and Alderman."

43. Law enforcement subsequently interviewed DOB Employee 1.[16] DOB Employee 1 has worked within the Department of Buildings for approximately fifteen years, is familiar with the building permit process, and currently holds a supervisory position within the department. DOB Employee 1's attention was directed to the email communications referenced immediately above. DOB Employee 1 explained that after s/he received the architect's email, s/he conducted a search of a computer database utilized by the Department of Buildings, and had determined there was no stop work order concerning the remodeling taking place at the restaurant. DOB Employee 1 was also unaware of any case in which an Alderman could bring a halt to remodeling work authorized by the Department of Buildings.[17] Furthermore, DOB Employee 1 advised the Department of Buildings would generally not shut down a project for months simply due to the absence of a permit for a pre-existing driveway. DOB Employee 1 advised that, while the Department of Buildings might use a driveway permit issue to bring attention to another problem with a project, it was not the practice of the department to

---

[16] DOB Employee 1's interview was conducted pursuant to a proffer letter that precluded the use of DOB Employee 1's statements against DOB Employee 1 except in certain narrow circumstances.

[17] DOB Employee 1 allowed that an Alderman's opinion was important, and that an Alderman could communicate concerns regarding a construction project to the Department of Buildings through a liaison.

use driveway permits to "jam up" a project. DOB Employee 1 was not aware of any issues with the restaurant that would have caused any deviation from this practice. I therefore believe that the information provided by DOB Employee 1 confirms that the action taken by BURKE and Ward Employee 1 was pretextual and done for the purpose of extorting Company A.[18]

44.     Records obtained from the City of Chicago reflect that on or about October 27, 2017, at approximately 11:55 a.m., an inspector for the City of Chicago's Department of Transportation, referred to as DOT Employee 2, issued a citation to Company A for not having a driveway permit for one of several driveways adjacent to the restaurant.

45.     DOT Employee 2's City Mileage Reimbursement Form for October 27, 2017, which was obtained from the City of Chicago, reflects that DOT Employee 2 traveled to BURKE's ward office, located at 2650 West 51st Street, minutes before s/he issued the citation to Company A. Specifically, these records reflect that DOT Employee 2 arrived at BURKE's ward office at approximately 11:05 a.m., and stayed there for fifteen minutes. The stated purpose of the trip was "Ald visit/[name of Aldermanic staff member redacted]." The mileage records reflect that after making an intermediate stop at 11:35 a.m., DOT Employee 2 then headed to the restaurant, arrived there at 11:55 a.m.—the same time that appears on the citation issued by DOT Employee 2. In a column

---

[18]     Law enforcement has interviewed other individuals who are employed within the City of Chicago's Department of Buildings and the Department of Transportation. Based on these interviews, it is not ordinary for the Department of Transportation or any other entity (such as an Alderman or ward employee) to stop construction on a project conducted pursuant to a permit issued by the Department of Buildings.

reserved for providing a reason for travel to the restaurant, DOT Employee 2 included the number of the citation s/he issued to Company A.

46. Records concerning the use of the cellular telephone issued to DOT Employee 2 by the City of Chicago reflect that on October 27, 2017, at approximately 11:34 a.m., approximately six minutes before DOT Employee 2 arrived at the restaurant, DOT Employee 2 received an incoming call from telephone number (773) 471-1470 that lasted five minutes. I know, based on interceptions conducted over the **Target Phone**, that telephone number (773) 471-1470 is associated with BURKE's ward office.

**F.  Company A's Efforts to Expeditiously Obtain a Driveway Permit are Thwarted by BURKE's Staff, including Ward Employee 1.**

47. Email communications produced by Individual A and Individual B reflect that on or about November 13, 2017, the architect advised Individual B that s/he would be going to City Hall the following day to apply for a driveway permit.

48. According to records maintained by the Department of Transportation, Company A applied for a driveway permit on or about November 14, 2017, for three pre-existing driveways adjacent to the restaurant.[19]

49. According to information provided by DOT Employee 1, an applicant seeking a permit for a pre-existing driveway must first obtain approval from the

---

[19]   Two of these driveways were included in the permits that were issued in 2012 and 2015, that are discussed in paragraph 29 above. One of the pre-existing driveways was not included in any prior permit, and was on land owned by Company A. The architect advised law enforcement that s/he believed the shut-down of the remodeling project based on the absence of these driveway permits was baseless, and that the driveway permits were used as a means to hold up the remodeling. The architect sought a permit for all three driveways—including the two pre-existing driveways that were a part of the 2015 permit—in order to satisfy BURKE and to allow the remodeling to continue.

Department of Zoning. Records obtained from the City of Chicago reflect that the Zoning Department approved Company A's driveway permit application on November 14, 2017, the same day it was submitted.

50. As noted earlier, on October 27, 2017, DOT Employee 2 issued a citation to Company A. Records obtained from Individual A and Individual B reflect that on or about November 27, 2017, an employee from the Department of Transportation wrote an employee of Company A an email notifying Company A of a hearing on the citation, scheduled for December 18, 2017, that "[t]he respondent should bring any driveway permit information, such as driveway permit or proof of application for driveway permit, to the hearing. Be advised that all corporations must [sic] represented by an attorney."

51. On or about November 29, 2018, law enforcement executed a search warrant at BURKE's ward office, located at 2650 West 51st Street, in Chicago. During the search, agents recovered a hard copy of an email dated November 28, 2017, and addressed from DOB Employee 2 to an AOL account.[20] The email read in part as follows:

> Hi [first name of Ward Employee 1]-
>
> Good Evening.
>
> It's been very nice working with you on this driveway matter. The driveway permit packet has been submitted by [architect] and is in the process of being evaluated by CDOT. There are simply side notes on the application concerning the second and third driveways. Please find the copy of the commercial driveway permit application and the accompanying photographs in the first attachment. I noticed,

---

[20]     Two hard copies of this email were recovered from the ward office. One copy was recovered from an internal office within the ward office. Based on information provided by a ward staff member, this office was utilized by Ward Employee 1 and another ward staff member.

upon looking at the 'ALTA/ACSM Land Title Survey,' that there is evidently an *Easement Agreement* concerning the ingress and egress for both parcel 2 and parcel 3. I highlighted the details for you. . . . . I hope this information assists you and Alderman Burke thus far. I wish you & yours a beautiful evening!

[Name redacted]

52. Another series of hard copy emails recovered during the search of the ward office concerned correspondence between a member of BURKE's staff and DOT Employee 3. The staff member asked for and received DOT Employee 3's telephone number, and then wrote the following to DOT Employee 3 on or about November 30, 2017 at 9:40 a.m.:

Ms. [name redacted]:

Thank you for the information. We've been trying to call you, can you please call the office so you can speak with [Ward Employee 1] at your earliest convenience?

Thank you,

[staff member name redacted]
Alderman Edward M. Burke | 14th Ward
[email address redacted]
2650 West 51st Street
Chicago, IL 60632
[telephone numbers redacted]

53. Email communications produced by Individual A and Individual B reflect that on or about November 30, 2017, at approximately 1:29 p.m. (several hours after the email referenced in the preceding paragraph), the architect advised Individual B that BURKE's Aldermanic office was attempting to hold up the issuance of the driveway permit. Specifically, the architect wrote in pertinent part:

> To update you as you know, I have applied for the drive
> permit for this location. I have known the driveway person I
> see at City Hall for a long time. I was asking for an update on
> our drive permit and she now tells me that the Alderman's
> office has called the drive dept on this to question or further
> hold on this. This is really not right. We need to send a letter
> to the Alderman's office stating that we have attempted many
> times to resolve this and have called to ask for a meeting. If
> we can't get further communication, we will be starting up the
> job again by X date because there are no Dept of Buildings
> holds on this. What are your thoughts?[21]

54.    Individual B advised law enforcement that s/he received the above-referenced email. Individual B noted that it was BURKE's office that demanded that Company A obtain a driveway permit, but it was BURKE's staff that was stopping Company A from getting this permit. Individual B stated that s/he believed at this point that BURKE was doing something "very shady and inappropriate," and that BURKE wanted to receive tax work.

55.    Email communications obtained from the architect reflect that on or about December 11, 2017, the architect received an email from DOT Employee 4, who wrote:

> Good morning. As a follow up, the Alderman's office spoke
> with [DOT Employee 3] and asked for this permit to be put on
> hold pending questions about the easement?
> I believe they are requesting that the easement needs to be
> updated? That you cannot use the old easement that was
> directed to an entity that no longer has interest in this
> property? I am handing the file to my Supervisor [DOT
> Employee 1] and you can follow up with [DOT Employee 1]

---

[21]    The architect advised law enforcement that DOB Employee 2 was the individual referred to as the "driveway person" in this email. Law enforcement interviewed DOB Employee 2, who had no recollection of telling the architect this information. DOB Employee 2 also did not recall communicating with Ward Employee 1 about the driveway permit issue. As noted above, DOB Employee 2 wrote a detailed email to Ward Employee 1 about the driveway permit. (DOB Employee 2 did not have an opportunity to review this email during his/her interview.)

on the processing of this permit pending conversations with
the Alderman for this ward. Thank you.

56. The architect responded to DOT Employee 4 by email on or about
December 12, 2017, at approximately 7:23 a.m., and wrote: "Thanks [DOT Employee 4].
This is ridiculous. I have never had this happen before and we have a meeting today with
the Alderman. Thanks for the update."[22]

57. Based on the foregoing, I believe that members of BURKE's staff,
including Ward Employee 1, contacted the Department of Transportation for the purpose
of hindering and obstructing the approval of the driveway permit sought by Company A
after the application was filed on November 14, 2017.

58. During the search of BURKE's ward office, agents also recovered a
memorandum dated December 12, 2017, addressed from Ward Employee 1 to "EMB,"
which I understand to be a reference to BURKE. The memorandum concerned the
remodeling of the restaurant. It read as follows:

> Met with [name redacted] of [restaurant] regarding their
> remodeling approximately a year and a half ago.
>
> Met with new ownership of [restaurant], [Company A] at site
> this past summer. (Had lunch with them at Beverly)
>
> They were reminded as new owners that they were required
> to update driveway permits, etc. prior to construction.
>
> They submitted their plans to COC, Building Department
> without doing so.

---

[22] The architect advised law enforcement that he wanted to attend the meeting with
BURKE to provide technical knowledge about the permitting process, but was not
invited.

We stopped construction on the site and it is still on hold while the Department of Transportation reviews the driveway permits that were submitted mid-November.

Footnote: They have hired a construction company from New Jersey to do the remodeling. Architect is a local from [city redacted], [name redacted].

I recall that you mentioned to them since they are out of [city redacted] they should think about local legal representation for the zoning matters and so forth.

### G. BURKE Again Corruptly Solicits Tax Business for His Law Firm from Individual A and Individual B.

59. Individual A advised law enforcement that Individual A and Individual B traveled to Chicago to meet with BURKE in December 2017.[23] At the time of the meeting, the restaurant remodeling project was still halted, and Individual A came to meet with BURKE in order to get BURKE to agree to allow the remodeling project to continue. Individual A understood at the time that, in order to resolve the issues with the remodeling project, Individual A would need to hire BURKE's law firm to do property tax work. Individual A also understood that BURKE had shut down the remodel because his law firm had not yet been hired.

60. During the meeting, BURKE asked why he had not received tax business. Individual A advised BURKE that Individual A had talked to a representative of Company A that handled property tax matters (hereinafter Individual E), and had told

---

[23] Individual B confirmed that he made plans for Individual A and Individual B to meet with BURKE on or about December 12, 2017, the date of the memorandum described above. Individual A and Individual B identified the location of the meeting and stated that it was a lunch meeting. Records obtained from this location do not reflect lunch charges on December 12, 2017, under BURKE's name, but do reflect charges for drinks under BURKE's name later that afternoon.

that individual to get the process started to hire BURKE's firm. Individual A gave BURKE the contact information for Individual E. Individual A believed that there was some discussion during the meeting of the remodeling of the restaurant, but did not recall the specifics of the discussion.[24] However, Individual A recalled that BURKE said he would try to resolve the issue and get the remodeling project started again. In addition, BURKE encouraged Individual A and Individual B to get involved with other politicians in Chicago, and asked them to attend a fundraiser for another local politician.

61. Individual A explained to law enforcement that s/he agreed to give BURKE tax business for BURKE's private law firm in order to avoid any further delays in the remodeling of the restaurant. Individual A stated that s/he did not want to lose any more money on the project, and it was clear that BURKE was going to interfere with the remodeling project until BURKE received property tax business for his law firm. Individual A stated his/her belief that BURKE had shut down the remodeling of the restaurant because BURKE had not received tax business, and that the driveway permit issue was just a pretext. Individual A stated that after s/he gave BURKE assurances that BURKE would receive tax business, the remodeling project was allowed to continue, which further demonstrated to Individual A that the project had been halted because BURKE's firm had not been hired.[25]

---

[24]     Individual B stated that there was only a brief discussion about the driveway permit during the meeting, and that approximately 85% of the conversation was about the real estate tax work BURKE wished to receive.

[25]     Individual B stated that what BURKE did at the meeting was not above board, and that the stop work order, the request that the company obtain a driveway permit, and the threat to hold approval of the driveway permit were all designed to get BURKE tax work.

62.     According to Individual A, the halt of the restaurant remodeling project had negative economic consequences on Company A in that it decreased sales at the restaurant. Specifically, the halt of the remodeling delayed the opening of the dining area of the restaurant for months, resulting in a loss of revenue.[26]

### H. BURKE Instructs City Employee 1 to Contact a Representative of Company A for the Purpose of Securing Tax Work for His Private Law Firm.

63.     Email communications obtained from Individual A and Individual B reflect that on or about December 13, 2017, at approximately 10:03 a.m., City Employee 1 wrote to Individual E as follows, using BURKE's personal AOL email account:[27]

> Alderman Burke recently met with [Individual A] and he instructed him to reach out regarding real estate tax appeal work in the metropolitan Chicago area. We just wanted to confirm this was the best method to reach you. Alderman Burke can be reached either via this email ([email address redacted]), his office number which is 312-744-3380, or his cell phone number which is [telephone number redacted].
>
> Thank you.
>
> [Name redacted]
> Assistant to Alderman Burke

---

[26]     According to Individual B, remodeling of the restaurant was halted between late October 2017 and January 2018, and this delay had a major effect on sales and cash flow at the restaurant. The halt to remodeling delayed the opening of the restaurant dining area for months, and as a result the restaurant ordered less food to adjust to lower sales volume. Individual D advised that the restaurant received supplies for its operation from a distributor in Wisconsin that delivers to the Chicago area. Individual D further advised that, during a remodeling project, when only a restaurant's drive-through was operational (as was the case here), there was generally a forty to fifty percent decline in sales. Accordingly, it is reasonable to believe that the prolonged delay in the completion of the remodeling of the restaurant resulted in a reduction of items supplied to the restaurant, thereby affecting interstate commerce.

[27]     I know, based on interceptions conducted over the **Target Phone**, that BURKE has provided this email address to third parties as a means of communicating with him.

312-744-3380[28]

64.     Email communications obtained from the architect reflect that on or about

December 13, 2017, at approximately 1:01 p.m., the architect wrote DOT Employee 4 as

follows:

> HI [DOT Employee 4] [Ward Employee 1] at Alderman
> Burke's office just called and said all is cleared up. He stated
> he called [DOT Employee 3]. Can you see if the drive permit
> can now be issued? thanks

65.     On or about December 15, 2017, at approximately 12:30 p.m. (Session

#8630), BURKE made an outgoing call on the **Target Phone** to City Employee 1, located

in his City Hall office. During the call, BURKE asked City Employee 1 if s/he had made

contact with Individual E. Specifically, BURKE asked, "Were you able to make contact

with that guy from the [redacted] company?" City Employee 1 responded, "No, he didn't

answer me back. . . . I sent him an email from your email actually too and he has not

answered." BURKE said, "Try again." City Employee 1 responded, "You want me to

email him again?" BURKE replied, "Yeah." City Employee 1 said, "Okay."

66.     Email communications obtained from Individual A and Individual B reflect

that on or about December 15, 2017, City Employee 1 wrote to Individual E as follows,

using BURKE's personal AOL email account:

> Hi [name redacted],

---

[28]     I know based on publicly available information that telephone number (312) 744-3380 is
associated with BURKE's City Hall office. The City of Chicago's Governmental Ethics
Ordinance provides in part as follows: "No official or employee shall engage in or permit
the unauthorized use of any real or personal property owned or leased by the City for City
business." *See* City of Chicago Government Ethics Ordinance, Municipal Code of Chicago,
Chapter 2, Rule 2-156-060.

I am just following up on the email below.

Thanks,

[Name redacted]
Assistant to Alderman Edward M. Burke
312-744-3380

67. In response to the preceding email, Individual E indicated on Friday, December 15, 2017, that s/he would be "reaching out on Monday." City Employee 1 in turn replied to this email the following Monday (December 18, 2017) as follows: "Thank you. We look forward to hearing from you today." Later that day, Individual E responded and set out the terms Company A and its affiliates had with their "current tax consultant."

68. On or about December 19, 2017, Individual E sent the following email to BURKE's personal email address:

[Name of City Employee 1 redacted],

Can you please confirm that I am sending all IL locations or only Cook County locations. Also, any other info I need to send?

Thank You
[Name redacted]

I. **The Department of Transportation Issues a Driveway Permit for the Restaurant and BURKE Confirms He is to Be Sent Tax Work for All Illinois Locations Operated by Company A.**

69. On or about December 19, 2017, at approximately 1:15 p.m. (Session #8698), BURKE received an incoming call on the **Target Phone** from City Employee 1. During the call, City Employee 1 informed BURKE of her receipt of the email in the preceding paragraph. Specifically, City Employee 1 said, "Um I just wanted to see, I got an email

33

from the [restaurant] tax guy and he's asking if he's sending all Illinois locations or only Cook County." BURKE responded, "Umm, all Illinois locations. Well, I'm relatively certain they're just metropolitan." City Employee 1 replied, "Chicagoland area, yeah." BURKE said, "Cook [County], Will [County]." City Employee 1 said, "Lake [County]." BURKE said, "Lake, umm, DuPage [County], etc." City Employee 1 responded, "Okay, sounds good." BURKE said, "Alright." City Employee 1 said, "Perfect, thank you."

70.     Email communications obtained from Individual A and Individual B reflect that on or about December 19, 2017, City Employee 1 wrote to Individual E as follows, using BURKE's personal AOL email account, and advised that the tax work "would be for all IL locations."

71.     Records obtained from Individual B and the Department of Transportation reflect that Company A's application for a driveway permit was approved on December 19, 2017, and then was issued several weeks later, after the driveway permit fee was paid.

72.     As noted earlier, Individual A advised law enforcement that, during Individual A and Individual B's meeting with BURKE, BURKE asked them to attend a political fundraiser for another politician. According to Individual A, Individual A felt it necessary to attend, or at least give a donation because, otherwise, BURKE would not support Individual A's efforts to do business in Chicago, including at the restaurant.[29] Individual A advised that Individual A made a $10,000 donation to a campaign committee

---

[29]     Individual B confirmed that Individual A made the donation because they felt they had to make the donation in order to ensure that there would be no further problems with BURKE.

for the politician, which was subsequently reduced to within the campaign contribution limit of $5,600.[30] Individual A advised BURKE s/he was not able to attend the event due to bad weather.

73. On or about January 21, 2018, at approximately 12:54 p.m. (Session #9784), BURKE made an outgoing call on the **Target Phone** to Ward Employee 1. During this call, BURKE and Ward Employee 1 discussed the status of the restaurant remodeling project. Specifically, Ward Employee 1 said, "Anything on your end working?" BURKE said, "Um, the guy from uh, [city redacted] asked me what he needs to do to get going again on the [restaurant]. I thought we gave them um, clearance on that?" Ward Employee 1 said, "I did. I called his um, architect [name redacted] immediately and he thanked me and he said, 'Appreciate everything you've done.' And I says, 'It's clear to take off.' He says, 'Thank you.' He says, 'I'll be right at it.' Right? So I, I mean that's a month ago." BURKE said, "And it's sitting there with uh, nothing going on." Ward Employee 1 said, "Well I mean I, immediately the same day I had talked to the guy [architect name redacted]. And I got it, uh, talking about uh, things starting uh, I saw they brought it in 'cause I'd gotten a call because they were going to start with the sub zero they pulled off on it a little bit. I saw they got their bulldozers at um, Archer and Kedzie for the Wintrust Bank to go up." BURKE said, "Okay." Ward Employee 1 said,

---

[30]   Based on public information disseminated by the Illinois State Board of Elections, it appears that Individual A's contribution was limited by law to $5,600. Law enforcement has reviewed records filed by the committee in question. They do not reflect a contribution made by Individual A, although correspondence provided by Individual A and Individual B reflects that the committee confirmed the contribution was made.

"That's gonna start. So. We shall see. I'll give that [architect name redacted] another call tomorrow then."

### J.   After the Remodeling of the Restaurant is Completed, Company A and Its Affiliate Do Not Give Tax Business to BURKE's Law Firm.

74.   Records provided by Individual A and Individual B reflect that in early to mid-2018, Individual E exchanged email correspondence with an attorney from BURKE's law firm, KB Attorney 1, who sought to finalize the terms of Klafter & Burke's retention pursuant to a contingent fee agreement. Individual E emailed Individual A on or about May 12, 2018, and asked Individual A: "Are we done with whatever we needed from Alderman Burke? I prefer not to give them our portfolio, I can say we signed a 3 year contract with our current agent who is very organized and nationally known and I am happy with their results. These guys seem very disorganized . . . ."

75.   Individual A explained that after Individual A received this email, Individual A advised Individual E that they had to hire BURKE's firm because they needed to ensure that the restaurant could continue in business without interference from BURKE.

76.   Thereafter, Individual E suggested in an email to KB Attorney 1 that Company A would provide a limited number of properties for BURKE's law firm to perform tax services for.[31]

---

[31]   In an email to KB Attorney 1, Individual E identified an affiliated company of Company A as the company that would enter into a retention agreement with Klafter & Burke for properties operated by Company A.

77.    Based on records obtained from Individual A and Individual B, by mid-2018, the remodeling of the restaurant was complete.  Individual A explained that Individual E did not want to give BURKE the tax business; Individual E strung the process out over several months and did not end up giving BURKE's law firm any tax business.

78.    Based on the foregoing, there is probable cause to believe that EDWARD M. BURKE has attempted, by extortion, to obstruct and affect commerce, in violation of Title 18, United States Code, Section 1951.

FURTHER AFFIANT SAYETH NOT.

EDWARD W. McNAMARA
*Special Agent*
*Federal Bureau of Investigation*


SUBSCRIBED AND SWORN to
before me on January 2, 2019.

SHEILA FINNEGAN
*United States Magistrate Judge*